Timothy Ellis McDANIEL and Jaran GOOKIN
*v.* STATE of Arkansas

CR 82-60                                    648 S.W.2d 57

Supreme Court of Arkansas
Opinion delivered March 21, 1983

632

*Tapp Law Offices,* by: *J. Sky Tapp,* for appellant McDaniel.

*Anderson & Anderson,* by: *Sam L. Anderson, Jr.,* for appellant Gookin.

*Steve Clark,* Atty. Gen., by: *Theodore Holder,* Asst. Atty. Gen., for appellee.

STEELE HAYS, Justice. Appellants, Tim McDaniel and Jaran Gookin, known as Jose, were convicted of the capital felony murder of Thomas Farnham, Jr., and sentenced to life without parole. For reversal, they argue three points in common: The trial court erred in refusing to sever the charges and try them separately; they were wrongfully restricted in peremptory challenges; and the trial judge should have granted motions for mistrial after telling the jury this "could very well be a divided type of trial".

Additionally, McDaniel contends grounds for a mistrial occurred when a witness stated McDaniel used an "alias"; that a statement allegedly made by McDaniel to a police officer was improperly admitted; and that the trial court erred in instructing the jury in accordance with AMCI 401. Gookin argues the trial court erred in not giving AMCI 403 to the jury in conjunction with 401; that it is cruel and unusual punishment for an accomplice to be subjected to

punishments imposed under the capital felony murder statutes, and that a motion for a directed verdict should have been granted because there was no evidence to rebut Gookin's affirmative defense that he did not solicit, induce or aid in the commission of the murder. We find the argument that the severance motions should have been granted to be persuasive and, accordingly, we reverse and remand the cases for separate trials.

On August 22, 1981, the Hot Springs Police Department received a report that Thomas Farnham, Jr. had been missing since the evening of August 16, when he had left home to meet Jose Gookin and Tim McDaniel at a 7-11 store on Park Avenue to demonstrate a machine gun. Farnham's whereabouts remained a mystery until August 30, when Mike Brewer, a friend of McDaniel, reported to the police that McDaniel had told him he had murdered Farnham. McDaniel and Gookin were taken into custody and each gave an account of Farnham's death, the major difference being that each accused the other of the murder. Farnham's body, badly decomposed, was found on information supplied by Gookin. McDaniel showed the police where he had hidden the machine gun and where he had thrown the murder weapon, a 22 pistol, in the lake. Both weapons were recovered.

Gookin and McDaniel agreed they had met Farnham on Sunday evening and driven out on Mill Creek Road in Gookin's sister's car to try out the machine gun McDaniel proposed to buy. Gookin says that Farnham and McDaniel each fired the machine gun as dusk was falling. Farnham called to Gookin to turn the car lights toward the target so he and McDaniel could examine the pattern. As he walked toward the car, Gookin says he heard a shot and turned to see Farnham clutch the back of his head and run toward the road. Gookin says he shouted at McDaniel, who then pointed the pistol at him. He says McDaniel shot Farnham a number of times and dragged his body out of sight. When he returned fifteen minutes later he was covered with blood and had the pistol, machine gun and Farnham's billfold con-

taining $22.00. Gookin says he refused McDaniel's offer to divide the money.

McDaniel's account largely reversed their roles: he says that as he watched, Gookin shot Farnham in the back of the head and dragged the body out of sight. According to McDaniel, they divided the money and Gookin dropped McDaniel off at his brother's home. McDaniel admitted keeping the machine gun and pistol, inadvertently leaving behind a sheet of instructions on the machine gun. Each man claimed the pistol belonged to the other and each denied knowledge of its presence until the murder occurred. In one other important respect their stories differed: McDaniel says he and Gookin wanted the machine gun to rob a jewelry store and planned to take it from Farnham simply by force, not by murder. McDaniel explains that the gun was illegal and Farnham would not have been able to report the robbery. Gookin denies any plan to rob either Farnham or a jewelry store — that McDaniel simply wanted to buy the gun, or so he thought. Gookin says McDaniel asked him later about the instruction sheet left in the car, from which Gookin retrieved it, hiding it in his bed. Gookin attributes hiding the instruction sheet and his failure to go to the police to McDaniel's threats that he would kill him if he reported the murder.

Shortly after the jury had retired it returned to tell the trial judge it was unable to determine who had actually pulled the trigger. In a bifurcated proceeding the jury found both men guilty and fixed punishment at life without parole. The verdict forms reflect an irreconcilable finding: on Form 2 (mitigating circumstances) as to McDaniel, the jury placed an "X" by Circumstance No. C (6), finding that "The capital murder was committed by another person and McDaniel was an accomplice and his participation relatively minor." But the identical finding was made with respect to Gookin, thus the jury found that neither Gookin nor McDaniel had committed the murder — that each was merely a passive participant. Hence, it is clear beyond question that the jury did not, or could not, segregate the

evidence with respect to the crucial issue of which defendant committed the murder.

Appellants insist that their motions to sever the informations and grant separate trials should have been granted, and for a number of reasons we have come to the conclusion that unless the arguments are sustained a manifest error will be left uncorrected.

Prior to the adoption of the Arkansas Rules of Criminal Procedure, our law gave the trial court discretion in granting severance of defendants in all but capital cases, where defendants were entitled to severance as a matter of right. Ark. Stat. Ann. § 43-1802 (Repl. 1977); *Vault* v. *Adkisson, Judge,* 254 Ark. 75, 491 S.W.2d 609 (1972). However, A.R.Cr.P. Rule 22.3 superseded § 43-1802 and gives the trial court discretion to grant or deny a severance in all cases. And we will not disturb that ruling on appeal in the absence of an abuse of discretion. *Hallman and Martin* v. *State,* 264 Ark. 900, 571 S.W.2d 688 (1979). Although we have uniformly upheld the trial court in cases where severance of defendants is denied, (*Spillers* v. *State,* 268 Ark. 217, 595 S.W.2d 650 [1980]; *Legg* v. *State,* 262 Ark. 583, 559 S.W.2d 22 [1977]), in doing so we have noted that the defenses were not antagonistic. See *Hallman and Martin* v. *State, supra; Ingram* v. *State,* 255 Ark. 6, 498 S.W.2d 862 (1973); see also *Washington, Ward and Hampton* v. *State,* 267 Ark. App. 1040, 594 S.W.2d 29 (1980). Thus, the current state of our law pertaining to severance of defendants in capital cases rests upon the sound discretion of the trial court, but while the discretionary power is broad, it is not unlimited, and the overriding duty of the trial judge is to determine that the defendants can be tried together without substantial injustice.

The rule recognized in many jurisdictions is that where defenses are antagonistic, severance should be granted and this principle has the sanction of the American Bar Association's Standards Relating to Joinder and Severance: "[I]t has

long been the view that defendants joined for trial should be granted a severance whenever their defenses are antagonistic to each other".[1]

In *Jenkins and Warner* v. *State*, 230 A.2d 262 (Del. 1967), the Delaware Supreme Court said that although severance is ordinarily a matter of discretion, where defenses are antagonistic, severance should be granted. The court observed that defenses are antagonistic when to believe one defendant, it is necessary to disbelieve the other. In *People* v. *Krugman*, 252 N.Y.2d 846 (1964) the Court stated that the need for severance most frequently arises when each defendant asserts his own innocence and accuses the other. In *Jung* v. *State*, 145 N.W.2d 684 (Wisc. 1966) the Wisconsin Supreme Court said that the demands of a fair trial require that such cases should be tried separately because the defendant should not be forced to face the double burden of having to meet the attack of both the prosecutor and his co-defendant. Louisiana has said that no more classic example of the need for severance exists than when two co-defendants each place the blame for the crime on the other. *State* v. *Singleton*, 352 So.2d 191 (La. 1977). See also, *State* v. *Thibodeaux*, 315 So.2d 769 (La. 1975), where it was said that a defendant ought not to stand trial before two accusers, a co-defendant and a prosecutor. In *People* v. *Braune*, 2 N.E.2d 839 (Ill. 1936) it was said that while the granting of a separate trial is within the sound discretion of the trial court, it is nevertheless a *judicial* and not an arbitrary discretion. *Braune* was much like the case before us in that each defendant admitted being present when the crime occurred, but each charged the other with the crime itself. The Illinois court noted, as well we might, that the trial was in many respects more of a contest between the defendants than between the prosecution and the defendants, saying "any set of circumstances which is sufficient to deprive a defendant of a fair trial if tried jointly with another is sufficient to require a separate trial."

---

[1] American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Joinder and Severance, Approved Draft, 1968, § 2.3 (b) commentary, PP. 40-41.

In *State* v. *Holup*, 355 A.2d 119 (Conn. 1974) the Supreme Court of Connecticut found that substantial injustice had occurred where severance was denied. Holup and Gordon, charged with kidnapping and robbery, were tried together. Gordon testified, Holup did not. Gordon's defense was that though he participated in the crimes, he did so only because Holup had coerced him at gunpoint. The court noted that Gordon was the most effective witness in the State's case against Holup in asserting his own submission to Holup's duress, that the two defenses were not only incompatible but completely antagonistic:

> "In the trial of a person charged with the commission of a crime, it is more important to enforce the time-tested safeguards which the law has erected for the protection of the innocent than to distort and subvert them in order to block the escape from punishment of even an apparently guilty person."

A thorough review of severance cases can be found at 82 ALR$^3$ 245 and 54 ALR$^2$ 858, from which these conclusions may be drawn: the issue of severance is to be determined on a case by case basis, considering the totality of the circumstances, with the following factors favoring severance: (1) where defenses are antagonistic; (2) where it is difficult to segregate the evidence; (3) where there is a lack of substantial evidence implicating one defendant except for the accusation of the other defendant; (4) where one defendant could have deprived the other of all peremptory challenges; (5) where if one defendant chooses to testify the other is compelled to do so; (6) where one defendant has no prior criminal record and the other has; (7) where circumstantial evidence against one defendant appears stronger than against the other. We think it significant that in some degree *all* of these factors are present here. McDaniel's defense and Gookin's defense could not have been more antagonistic, each was almost the mirror image of the other. The difficulty of segregating the evidence to determine which defendant was actually guilty of the crime is fully demonstrated by the

irreconcilable jury verdicts finding that neither defendant actually pulled the trigger. Even without Gookin's testimony, the State's case against McDaniel was clearly supported by substantial evidence; in contrast, the case against Gookin was almost non-existent except for McDaniel's testimony. Too, the circumstantial evidence was stronger against McDaniel than Gookin. A pivotal issue centered on the murder weapon. (We note it was McDaniel who kept it when the two men parted company after the murder, and it was McDaniel who later threw it in the lake). Had the ownership of the pistol been shown, it would doubtless have better enabled the jury to unravel the conflicting accounts, as each defendant claimed the pistol belonged to the other. Yet evidence of this crucial fact *was* available — the statement given the police by Mike Brewer,[2] a key witness called by the State, shows unmistakably that Brewer was familiar with the pistol and knew it belonged to McDaniel. However, this evidence was not elicited by either Gookin or the State, though the State at least had knowledge of it.

Considering the totality of the circumstances of this case and the obvious inability of the jury to resolve the issue of guilt, we believe these defendants were entitled to separate trials. We do not suggest that simply because defenses are antagonistic the trial court must grant severance or risk reversal, merely that where the defenses are antagonistic, particularly in capital cases, careful consideration should be given to *all* the factors which weigh for or against achieving substantial justice in the trial process, and where it can be seen that either defendant is unduly jeopardized by a joint trial, severance should be granted. Here, there was an evident strategy by the prosecution to permit these two defendants to try each other which, in the end, tainted the result by leaving the ultimate issue unanswered.

To the argument that it doesn't matter which defendant was the actual murderer, that both are equally guilty as

---

[2] A transcription of Brewer's statement to the police was introduced at a pre-trial hearing and appears in the record in its entirety.

principal or accessory, there are two answers: first, by Gookin's account, he had no knowledge that a crime of any kind was in the offing, yet if that account is true, he stands convicted of a capital murder *only* because the jury was confused; on the other hand if McDaniel's account is true, while McDaniel is guilty of planning and executing a robbery, he was not an accessory to murder. Moreover, not even by accepting a combination of the two accounts can we perceive how the jury could have arrived at the conclusion that these defendants were equally culpable. Under our system, the jury decides guilt and then fixes the punishment it deems appropriate. In a capital case it may fix a lesser punishment simply as an act of mercy, but it may not impose a greater punishment, indeed *any* punishment, as an act of doubt. Here, it is conceivable the jury would have chosen to impose the death penalty on the defendant who actually committed so loathsome a crime as this one, and chosen to impose a more lenient punishment on the defendant who was, as each claimed to be, caught by surprise by the murder. Thus, in spite of its best efforts, this jury may well have given a lesser sentence to one defendant, and a greater sentence to the other, than it might otherwise have done. Our system, thankfully, will not leave such fortuitous results undisturbed.

Turning to the other points for reversal, on the issue of AMCI 401 and 403, 403 should have been given in view of Gookin's testimony; however, no request for the instruction was made. At any retrial of Gookin, if the evidence warrants, then both instructions would be appropriate. As to McDaniel's argument that it was error to admit the testimony of Robert Merchant, a Hot Springs police officer, that McDaniel told him he would not be in the fix he was in if he had killed the witness, referring to Gookin, there was no error. There was no evidence the officer was seeking information from McDaniel; on the contrary, it is clear that McDaniel made a spontaneous comment against his interest which the court properly admitted. The argument that the probative value of the statement was outweighed by its prejudicial effect is equally without merit. The other

arguments are either cured by the fact the defendants will be tried separately or will not, in all likelihood, arise again.

The judgment is reversed and the case is remanded to the trial court for separate trials.